**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
KAREN A. INGRASSIA,

                    Plaintiff,                    **MEMORANDUM OF**
                                                  **DECISION & ORDER**
          -against-                               16-cv-00995 (ADS)

CAROLYN W. COLVIN, Acting Commissioner
of Social Security,

                              Defendant.
---------------------------------------------------------X

**APPEARANCES:**

**Law Offices of Harry J. Binder and Charles E. Binder, P.C.**
*Attorneys for the Plaintiff*
60 East 42nd Street
Suite 520
New York, NY 10165
          By:     Charles E. Binder, Esq., Of Counsel

**United States Attorney's Office for the Eastern District of New York**
*Attorneys for the Defendant*
271 Cadman Plaza East
Brooklyn, NY 11201
          By:     Rukhsanah L. Singh, Assistant United States Attorney

**SPATT, District Judge**:

          On February 29, 2016, the Plaintiff Karen Ingrassia (the "Plaintiff" or the "claimant")

commenced this civil action pursuant to the Social Security Act, 42 U.S.C. § 405 *et seq.* (the

"Act"), challenging a final determination by the Defendant Acting Commissioner of Social

Security Carolyn W. Colvin (the "Commissioner"), that she is ineligible to receive Social Security

disability insurance benefits.

          Presently before the Court are the parties' cross motions, pursuant to Federal Rule of Civil

Procedure ("FED. R. CIV. P." or "Rule") 12(c) for judgment on the pleadings.  For the reasons that

1

follow, the Plaintiff's motion is granted in its entirety and the Commissioner's motion is denied in its entirety.

## I. BACKGROUND

### A. Procedural History

On February 5, 2013, the Plaintiff filed for Social Security disability benefits. She alleged that she had been disabled since August 10, 2008. The Plaintiff's application was denied, and she requested an administrative hearing.

On July 15, 2014, Administrative Law Judge Andrew S. Weiss ("ALJ Weiss" or the "ALJ") conducted an administrative hearing. The Plaintiff was represented by counsel. At the hearing, the Plaintiff amended her alleged onset date of disability to February 2, 2009.

On August 14, 2014, the ALJ issued a written decision denying the Plaintiff's claim. The Plaintiff requested a review from the Social Security Appeals Council (the "Appeals Council"). On January 6, 2016, the Appeals Council denied her request and the ALJ's decision became the Commissioner's final decision.

### B. The Administrative Record

#### 1. Relevant Medical Evidence

##### a. Before the Relevant Period (Prior to February 2, 2009)

On August 21, 2008, the Plaintiff underwent arthroscopic surgery of her left knee with reconstruction of the anterior cruciate ligament (the "ACL") and hamstring autograft and medial meniscal repair. The surgery was conducted by orthopedic surgeon Dr. Jeremy Idjadi ("Dr. Idjadi"). After the operation, the Plaintiff was diagnosed with a left knee ACL tear with a grade 3 sprain; left knee medial meniscus tear; and chondromalacia of multiple compartments, medial and lateral.

On August 28, 2008, the Plaintiff followed up with Dr. Idjadi. She reported to him that she had gone to the emergency room due to a brief period of redness in her leg. An examination revealed numbness laterally and distally to the tibial incision; a trace amount of warmth; mild to moderate effusion; loss of 3 to 5 degrees from straightening her knee; flexion limited to 45 degrees; pain and guarding with range of motion; and some edema around her ankle. A venous duplex scan was negative for deep vein thrombosis ("DVT"). The Plaintiff stated that she had not yet started physical therapy because she had transportation issues. Dr. Idjadi prescribed physical therapy, Percocet, and OxyContin, and told the Plaintiff not to bear any weight on her left leg.

On September 4, 2008, the Plaintiff, who arrived to the appointment in a wheelchair, told Dr. Idjadi's physician's assistant ("PA") that she was experiencing significant discomfort; that she needed home health physical therapy because of the level of her pain; and that she was primarily isolated to the upper floor of her home. The Plaintiff's sutures were removed without significant difficulty. Two-view X-rays of the left knee demonstrated appropriate ACL fixation components. Dr. Idjadi's PA assessed a reasonably good course post left ACL reconstruction and lateral meniscus repair. The PA advised the Plaintiff to remain in a Bledsoe Brace at zero degrees with partial weight bearing on the operative side. He further prescribed Vistaril.

A patient progress report dated September 30, 2008 notes that the Plaintiff had six total physical therapy sessions as of that date, but only one of those visits occurred after her operation. She had begun physical therapy on July 17, 2008. The Plaintiff was unstable when descending stairs and had a tender knee, with poor control and tone.

On October 2, 2008, the Plaintiff stated that she had made great progress with physical therapy. The Plaintiff was using a crutch to walk, and her hinged knee brace for "protection." She said that she only took Percocet at night. Her left leg was neurovascularly unchanged distally.

She had mild-to-moderate swelling in the ankle extending up to the calf; decreased muscle tone; and weakness graded as 4+/5. Flexion of the knee was 105º to 110º, passively, and extension was about 180º. Dr. Idjadi prescribed a duplex scan to rule out DVT and recommended home exercises and PT. A lower extremity venous duplex scan conducted on October 2, 2008 revealed no evidence of DVT.

On November 5, 2008, the Plaintiff told Dr. Idjadi's staff that she felt like her improvement had hit a plateau. On examination, the left leg exhibited trace effusion. Dr. Idjadi instructed her on additional home exercises and completed a form for modified duty.

When the Plaintiff returned for a follow-up on November 26, 2008, she reported that her pain was progressively worsening following aggressive physical therapy. She further stated that she experienced pain when she shopped or ran errands for more than 90 minutes. Physical examination revealed minimal inflammation in and around the knee joint; no joint effusion; point tenderness near the point of surgery; flexion to approximately 120 degrees; some "marked" atrophy compared to the right side; and weakness with knee extension. X-rays of the left knee revealed a well-seated staple in the proximal tibia and a well-seated transfix pin in the distal femur, without evidence of lysis or failure of the components. The Plaintiff was advised to decrease her physical therapy from four days a week to three; and to limit running errands to two to three hours per day. She was prescribed Voltaren and Ultram.

On December 4, 2008, Dr. Idjadi's physical examination of the Plaintiff revealed that flexion was 5 degrees short of full activity; and a hamstring popliteal angle about 50º, with tightness posteriorly. Dr. Idjadi noted trace effusion again. The Plaintiff's ACL was solid and there no sign of a meniscal problem. Dr. Idjadi prescribed Voltaren gel. The Plaintiff attended physical therapy that day as well.

On December 23, 2008, the Plaintiff told Dr. Idjadi that she had been fired from her job, but she believed that she had "turned the corner." On examination, her left leg was neurovascularly intact, with the incisions well healed; she had almost full flexion; she had solid stability and her ligaments were not tender; she had inflammation and moderate tenderness in her knee and hamstring. There was no erythema, warmth, effusion, or pain with movement. She received an injection of Marcaine with epinephrine in her left knee. Dr. Idjadi prescribed Voltaren gel, icing, and physical therapy.

On January 2, 2009, the Plaintiff saw a PA in Dr. Idjadi's office who gave her a second Marcaine injection. The Plaintiff told the PA that the last injection had caused a decrease in her pain. The PA Noted tenderness in the Plaintiff's hamstrings, and that her range of motion was a well-preserved zero degree of extension to 125 degrees of flexion.

On January 20, 2009, Plaintiff returned to Dr. Idjadi. She reported that the steroid injection had helped. She further told Dr. Idjadi that she had obtained a new job and believed she was capable of performing all the job's duties. She had no complaints. On examination, she had full strength and range of motion in her left knee.

### b. During the Relevant Period (February 2, 2009 through August 14, 2014)

On February 2, 2009, a physical therapy report noted that the Plaintiff's range of motion had increased, and that she had met her physical therapy goals.

When the Plaintiff returned to Dr. Idjadi on February 24, 2009, she told him that her knee had buckled less than a week earlier, and that her pain had returned. A physical examination revealed trace effusion; mild global tenderness in the areas of the joint capsule and lateral joint line; mild opening at 15 degrees; a painful patellofemoral compression test; and mild patellofemoral crepitus. Her ACL was stable. Dr. Idjadi did not know the reason for the setback,

but diagnosed her with a mild MCL sprain.  He recommended that she wear a hinged knee brace, treat with ice, and take Celebrex.

A March 11, 2009 MR Arthrogram of the Plaintiff's left knee showed a vertical re-tear of the medial meniscus; a small horizontal tear in the lateral meniscus; and a moderate sized chondral flap in the weight-bearing portion of the medial femoral condyle with small focus of moderately severe cartilage loss in the weight bearing portion of the lateral tibial plateau.  The ACL repair was intact.

On March 13, 2009, the Plaintiff told Dr. Idjadi that she had another episode of buckling, which had preceded the MR Arthrogram.  The Plaintiff said that her knee had gotten progressively worse, that it was quite painful, and that the pain was limiting her daily activities and job functions to a great degree.  The Plaintiff listed her daily pain as an 8 or 9 out of 10.  Exam revealed mild to moderate left knee effusion, "exquisite" medial joint line tenderness, mild medial collateral ligament tenderness and pes region tenderness, and flexion to 120 degrees.  Dr. Idjadi recommended further arthroscopic surgery, and instructed the Plaintiff to wear the knee brace and modify her activities.  He prescribed Tramadol and Percocet.

On March 26, 2009, the Plaintiff underwent a second arthroscopic surgery for medial meniscectomy; removal of a loose body; and shaving chondroplasty and debridement.  The surgery was performed by Dr. Idjadi.

A March 30, 2009 venous duplex scan of the Plaintiff's left leg showed no evidence of DVT or superficial thrombophlebitis.

On April 9, 2009, the Plaintiff followed up with Dr. Idjadi's office.  She said that she had started physical therapy, that she was taking oxycodone only at night for pain.  Her range of motion was 0º of extension and 115º of flexion.  There was tenderness to palpation around the incision

sites, mild effusion, and a slight antalgic gait. The Plaintiff was directed to continue physical therapy three times a week, and she was prescribed more oxycodone.

On April 14, 2009, the Plaintiff reported to Dr. Idjadi that the sharp pain in her knee was worsening. Physical examination revealed mild tenderness along the hamstrings; moderate to severe tenderness along the medial joint line; extension 5 degrees short of full extension; flexion over 130 degrees. Dr. Idjadi administered another steroid injection. There was an increased range of motion following the injection.

An April 16, 2009 physical therapy report noted that the Plaintiff had tolerance for activity and walking, but had difficulty with endurance and descending stairs. A report from May 5, 2009 noted that the Plaintiff had improved in her tolerance for walking and performing errands.

On May 6, 2009, the Plaintiff reported that the steroid injection had helped and that she felt she was progressing. Dr. Idjadi noted that the Plaintiff's patella was "somewhat socked in with decreased medial lateral mobility, . . . with inability to bring the tilt to neutral even passively." (R. at 347).

On May 21, 2009, the Plaintiff told Dr. Idjadi that she had experienced another buckling episode. She complained that she could not walk for long periods of time. An exam revealed peripatellar tenderness of the distal aspect of the patella and femoral and lateral facets; positive patellofemoral grind test with mild patellofemoral crepitus; medial joint line tenderness; and tightness with deep flexion of the knee. Dr. Idjadi noted that there was no evidence of ongoing meniscal injury, although there was some tenderness. Dr. Idjadi recommended that the Plaintiff receive a second opinion from his partner, Dr. Peter Mandt ("Dr. Mandt").

On May 26, 2009, Dr. Mandt examined the Plaintiff. He believed that the Plaintiff's pain was related to some arthrofibrosis, with possible notch impingement. The doctor noted her prognosis was not good because of her body weight. He suggested another steroid injection.

On June 4, 2009, Dr. Idjadi administered another steroid injection. The Plaintiff's physical examination on that date was unchanged from May 21st, except that Dr. Idjadi emphasized the tenderness in the Plaintiff's knee.

On June 16, 2009, Ms. Ingrassia stated that the injection helped the sense of "fullness" in her knee, but did not decrease her pain at all. She continued to wear a knee brace and ice her knee, but had an increase in pain following a session of physical therapy. An examination revealed pain with full hyperextension of the knee, anteromedial joint line tenderness adjacent to the patellar tendon and nearby the previous anteromedial incision, and joint effusion. Dr. Idjadi noted that the Plaintiff's pain may have been due to arthrofibrosis and some notch impingement. After a discussion, the Plaintiff intimated that she wanted another arthroscopic surgery. A physical therapy report three days later on June 19, 2009 noted that the Plaintiff felt frustrated with her lack of progress and her inability to return to work.

A July 14, 2009 x-ray showed degenerative changes in her right knee. Dr. Idjadi assessed possible rheumatologic or systemic joint problems, likely aggravated by overuse and being overweight

On August 4, 2009, the Plaintiff reported that she had an independent medical examination performed by Dr. Bradley Billington who mentioned possibly debriding the pes bursitis, and noted decreased range of motion of some 8 degrees of flexion. Dr. Idjadi noted no significant changes from the June 16, 2009 examination, other than moderate tenderness with some soft tissue swelling. Her range of motion was a few degrees of hyperextension.

The Plaintiff underwent a third arthroscopic surgery on August 10, 2009, which included lysis of adhesions in the knee; chondroplasty of the medial femoral condyle; and an open pes bursectomy/debridement.

On August 24, 2009, the Plaintiff told a PA at Dr. Idjadi's office that she had some foot swelling and tenderness, but did not go to the emergency room. The Plaintiff was prescribed Percocet.

On September 15, 2009, the Plaintiff told Dr. Idjadi that her hamstrings were bothering her and she had some numbness. On examination, there was subjective decreased sensation distal to an incision point, but sensation was grossly intact. She had almost full flexion and extension strength. The doctor assessed possible nerve inflammation; prescribed Neurontin; and recommended vitamins.

On October 2, 2009, the Plaintiff reported that she had an onset of pain the previous night. An examination showed subjectively decreased sensation in her left knee near the incision but it was otherwise grossly intact. Dr. Idjadi recommended a gradual resumption of activities with the physical therapist; a knee brace; icing; and continued medications. He cautioned against deep knee squatting and deep knee bending with any resistance.

A physical therapy report from October 13, 2009 noted that the Plaintiff walked for short distances with an antalgic gait.

On November 3, 2009, the Plaintiff reported to Dr. Idjadi that she was doing slightly better, but had a setback earlier that day when her knee gave out. The doctor believed that the most likely cause of the setback was pain and quad inhibition. He recommended a brace and a cane, icing and elevation, as well as physical therapy. He asked her to see another one of his partners, Dr. Tom Castle for an evaluation of her knee.

Dr. Castle evaluated the Plaintiff on November 12, 2009. An examination revealed an irritable patellofemoral joint, with pain on forced extension, and diffuse tenderness. He noted that she had very little tone and quad strength. Dr. Castle stated that "[t]here [was] little question in [his] mind that her tolerance of activities for 25 to 30 minutes followed by increasing knee pain and episodes of giving way is due to profound underlying weight strength ratio issues." (R. at 320). He said that there was no gross effusion, but that her strength would be difficult to build back up if she had ongoing pain in her knee. He believed that she either had ongoing inflammatory synovial impingement or was developing real pain from persistent low transmission through a large femoral condylar defect. He recommended a bone scan; selective injection; and physical therapy.

A December 2, 2009 bone scan showed moderately intense increased activity at the medial aspect of the knee joint, compatible with arthritis or an occult fracture. It also showed less intensity in the proximal left tibia consistent with arthritis, as well as some activity in the distal right femur.

The Plaintiff followed up with Dr. Idjadi on December 4, 2009. She said that she experienced pain with weight bearing, and had a decreased tolerance for exercise. Examination of the left knee revealed effusion; mild pes tenderness; moderate medial joint line tenderness; mild peripatellar tenderness; decreased tone in the quadriceps; weakness graded at 4 to 4+/5 on the left compared to right; and decreased bulk of the left quadriceps. Dr. Idjadi's assessment of the bone scan was that there was evidence of symptomatic chondromalacia/degenerative disease particularly of the medial femoral condyle. He recommended low impact exercise and an unloader brace.

The Plaintiff had follow-up examinations with Dr. Idjadi on December 8, 2009, December 14, 2009, and January 15, 2010. The Plaintiff told Dr. Idjadi that she was depressed. Dr. Idjadi

recommended that she see a psychologist; a pain management specialist; and an orthopedist; and prescribed Norco.

A February 5, 2010 MRI of the Plaintiff's left knee showed an intact ACL graft; post partial meniscectomy of the medial meniscus; partial thickness chondral loss with fraying fibrillation along the inferior aspect of the medial femoral condyle with underlying reactive bone marrow edema that was likely degenerative and stress related; chondral softening; small knee joint **effusion; and scarring** seen in the fat pad.

On March 16, 2010, the Plaintiff followed up again with Dr. Idjadi, after seeing Dr. Jeff Stickney for an outside opinion. Dr. Stickney had recommended selective steroid injections; possible viscosupplementation; and a partial knee replacement. The Plaintiff told Dr. Idjadi that she was having difficulty wearing her unloader brace. She also reported that she had met with a psychiatrist, was taking psychiatric medications, and was scheduled to begin pain management. An examination revealed tenderness on deep palpation along the tibial incision; tenderness along the medial joint line; and mild medial peripatellar tenderness. There was no gross instability. Dr. Idjadi assessed continued left knee pain, multifactorial in origin and likely related to possible neuroma or nerve irritation to the tibial incision, as well as medial compartment osteochondral injury.

On May 18, 2009, the Plaintiff received a viscosupplementation injection. At a follow-up on June 24, 2010, the Plaintiff told Dr. Idjadi that she had run into the street to chase her dog, and that it had caused her some pain. Dr. Idjadi noted that he could not tell if the Synvisc injection helped due to the recent injury.

On July 22, 2010, Dr. Idjadi noted patellofemoral crepitus and a positive patellofemoral grind test; and inflammation with possible neuroma or nerve-based symptoms. The Plaintiff

requested consideration of chondral repair; knee replacement; or partial knee replacement. Dr. Idjadi referred the Plaintiff back to Dr. Castle for a consult on a partial knee replacement.

On July 27, 2010, Dr. Castle assessed medial compartment degenerative joint disease, pes tendonitis, and hyperacute tender hardware. He noted that Plaintiff had very poor muscle tone, particularly given her obesity, and that there was a lot of palpation tenderness and withdrawal pain. Dr. Castle stated that the Plaintiff needed to regain muscle bulk and control her symptoms by using an unloader brace before any intraarticular procedure. He recommended hardware removal and pes rehabilitation.

On August 17, 2010, the Plaintiff received another steroid injection from Dr. Mandt. Dr. Mandt noted that an MRI conducted revealed an intact ACL graft; increasing medial compartment degenerative changes; and the absence of the bulk of the meniscus. The Plaintiff reported that she was taking Prozac, trazodone, Daypro, and Klonopin. She said that she smoked; drank socially; and worked as a registered nurse at a care facility.

On August 27, 2010, Dr. Idjadi noted that the Plaintiff had lost some weight. The Plaintiff elected to pursue a left knee medial partial arthroplasty; tibial staple removal; bursectomy; and nerve exploration. Dr. Idjadi listed the risks, benefits and alternatives of the different treatment options. Among them, he said that the Plaintiff's problem may not be curable, that she was in a difficult situation and likely to have ongoing knee issues for "quite a long time, maybe even forever. . . . she is likely going to need other knee surgeries in the course of her life." (R. at 286).

On September 8, 2010, the Plaintiff presented again to Dr. Mandt. Dr. Mandt's physical examination revealed similar findings to the examination from August 17, 2010. He suggested a partial knee replacement, with removal of the hardware and subcutaneous debridement.

On October 1, 2010, the Plaintiff reported to Dr. Idjadi that she was unable to perform activities of daily living. She had lost 40 pounds. Dr. Idjadi noted that the Plaintiff was indicated for surgery because other treatments had failed. He also noted that insurance had not approved the partial knee replacement surgery. On November 9, 2010, the Plaintiff told Dr. Idjadi that her pain was increasing throughout the day and worsening at night.

On November 29, 2010, the Plaintiff was seen by Dr. Jason Kim ("Dr. Kim"), a pain management specialist. The Plaintiff said that her left knee pain began in June 2008 as a result of a work-related injury. She told Dr. Kim that her pain at its worst was a 10 out of 10, at least a 2 out of 10, and on average a 4 out of 10. Dr. Kim diagnosed chronic left knee pain status-post 3 surgeries, depression, and anxiety. He prescribed Mobic. The Plaintiff followed up with Dr. Kim on February 8, 2011. She told him that the medication helped, but that she was in a lot of pain following physical therapy.

The Plaintiff returned to Dr. Idjadi on March 21, 2011. She told him that she was experiencing deep pain and occasionally experienced clicking and catching. A physical examination revealed left knee extension to 180 degrees with some effort; flexion to 125 degrees with pain; and tenderness along and below the medial joint line. Dr. Idjadi noted that the Plaintiff had lost more weight. Dr. Idjadi administered another steroid injection and recommended that she attempt to receive insurance coverage for additional surgery. The Plaintiff reported that the majority of her pain was alleviated by the injection.

On May 10, 2011, the Plaintiff told Dr. Kim that the pain had returned after the steroid injection. She had gained five pounds and was taking Norco for pain relief. There were no significant changes noted or on June 10, 2011 or on June 16, 2011. Dr. Kim noted that the Plaintiff

would benefit from psychological therapy, and that she was moving to New York and would establish care there.

On October 12, 2011, the Plaintiff presented to Dr. Scott Alpert ("Dr. Alpert") in New York. She complained of persistent knee pain, and said that she had difficulty walking distances. Her medications included Norco, Mobic, Prozac, clonazepam, and trazodone. Dr. Alpert's examination revealed that she was in moderate distress; full range of motion in her left knee with trace effusion; and significant medial joint line pain with a positive McMurray's sign. There was no instability and the ACL reconstruction appeared intact. An x-ray showed some periarticular changes but no narrowing. There was evidence of hardware in the knee but no tumors or masses. Dr. Alpert prescribed an MRI of her left knee.

The November 10, 2011 MRI showed an intact ACL reconstruction with a severely degenerated and torn posterior horn remnant of the medial meniscus; medial femorotibial osteoarthritis; and a mildly degenerated posterior cruciate ligament.

The Plaintiff went to the emergency department at Huntington Hospital after a motor vehicle accident on November 18, 2011. She complained of neck, chest, and head pain.

On November 21, 2011, the Plaintiff returned to Dr. Alpert. She reported severe pain and that she had difficulty walking; using stairs; sleeping; squatting; and pivoting. Dr. Alpert noted that her MRI showed severe articular cartilage injury to the medial femoral condyle, and mild changes to the lateral femoral condyle, patellofemoral joint. An examination revealed limited motion in the left knee, varus deformity, and medial joint line pain. Dr. Alpert administered a steroid injection. He noted that the Plaintiff "remain[ed] totally disabled." (R. at 430). Dr. Alpert administered three Euflexa injections on January 4, 11, and 18, 2012.

On March 19, 2012, the Plaintiff reported that she experienced little improvement from the Euflexa injections. Dr. Alpert noted that the MRI showed cartilage damage along the medial femoral condyle and her ACL was intact; and that the x-rays from October showed no narrowing of the joint. He referred her to Dr. Nick Sgaglione ("Dr. Sgaglione") for a cartilage transplant.

On June 11, 2012, the Plaintiff told Dr. Alpert that she had continued pain, and he believed it was consistent with mild to moderate osteoarthritis. Dr. Sgaglione informed Dr. Alpert that the Plaintiff was not a good candidate for cartilage resurfacing and that he was "not optimistic." On examination, she was neurovascularly intact, with severe pain and swelling over the surgery area. She had full range of motion with trace effusion and diffuse joint line tenderness. Dr. Alpert recommended hardware removal of the medial staple and arthroscopic debridement of the left knee. He further stated that the Plaintiff was mostly likely a candidate for total left knee replacement.

On July 6, 2012, the Plaintiff underwent her fourth knee surgery, which included synovectomy and removal of hardware. Dr. Alpert noted that the Plaintiff was doing well at a follow-up on July 16, 2012.

On August 27, 2012, the Plaintiff followed up with Dr. Alpert, who noted that she was doing very well "with regards to the hardware removal, having just limited pain over the area of concern. Unfortunately, the pain in the knee still persists although not as bad." (*Id.* at 423). The Plaintiff had excellent range of motion, only 10 degrees short of flexion; slight effusion; mild tenderness; and mild joint line pain.

On October 22, 2012, the Plaintiff complained of "severe pain," that worsened with physical therapy. She had difficulty walking and standing. She had full range of motion; medial

joint line pain with a positive McMurray's sign; no instability; and severe pain over the pes bursa. She was given steroid injections in her left knee and pes bursa.

The Plaintiff returned to Dr. Alpert on December 3, 2012, and told him that she had the injections had given her temporary relief in her knee, but that she did not receive much relief in her pes bursa. On examination, Dr. Alpert noted that she was much better than before the surgery but was still significantly uncomfortable. He stated that she had difficulty walking and standing. Dr. Alpert recommended that the Plaintiff consider total knee replacement because she had "essentially failed conservative management with weight loss, Synvisc, Cortisone, and arthroscopic debridement." (*Id.* at 421). On December 30, 2012, the Plaintiff went to the Huntington Hospital emergency department for right shoulder pain.

On February 26, 2013, the Plaintiff underwent her fifth knee surgery, which was a total knee replacement. The surgery was performed by Dr. Alpert. An x-ray taken after the surgery on February 26, 2013, showed good anatomic alignment. A February 28, 2013 ultrasound of the legs was "unremarkable." (*Id.* at 507). She was discharged to a rehabilitation facility on March 1, 2013, with a diagnosis of left knee osteoarthritis and degenerative joint disease.

On April 8, 2013, Dr. Alpert completed a Lower Extremities Impairment Questionnaire. He diagnosed Plaintiff with knee osteoarthritis; cruciate ligament in the knee; joint knee pain; and total knee replacement. The Plaintiff had a limited range of motion, 5 to 120 degrees with varus deformity and an abnormal gait. Dr. Alpert cited the October and November 2011 x-ray and MRI as supporting his diagnoses. The Plaintiff's primary symptoms were pain; trouble walking, and changing from sitting to standing; pain with stairs, squatting, and kneeling; and knee instability. The knee and leg pain was constant. Dr. Alpert reported that she was unable to independently walk; sustain walking or complete an activity. She needed a cane and walker, and would possibly

need a wheelchair. The Plaintiff's pain prevented or interfered with her ability to walk effectively; she could not climb stairs without the help of a handrail; and could not complete daily activities without assistance, including traveling to appointments, preparing meals, and bathing/dressing. Her pain was not completely relieved with medication without unacceptable side effects.

Dr. Alpert also completed a section where he estimated the Plaintiff's abilities. He said that the Plaintiff could sit for four hours in an 8 hour day; stand or walk for one hour in an 8 hour day; she could not sit continuously in a work setting out of medical necessity/recommendation; she would have to get up and move around hourly; she would have to sit back down every ten minutes; it would be necessary for her not to stand or walk continuously; she could frequently lift/carry up to ten pounds, occasionally lift/carry up to 20 pounds; and never lift/carry more than 20 pounds. Her legs did not need to be elevated. Her experience of pain or other symptoms would frequently interfere with her attention and concentration. Dr. Alpert expected that the Plaintiff's impairments would last at least another twelve months. He did not believe that emotional factors contributed to her symptoms and limitations; and believed that she was capable of tolerating low amounts of work stress. He noted that the Plaintiff would need to take unpredicted breaks lasting fifteen minutes every day; would have to miss work more than three times a month due to her impairments; that she has good days and bad days; and that she could not push, pull, kneel, bend or stoop at work.

On April 30, 2013, Dr. Samir Dutta ("Dr. Dutta") performed a consultative orthopedic examination for the Social Security Administration. At the time, the Plaintiff was taking Prozac, Klonopin, Trazadone, OxyContin, Oxycodone, and Celexa. The Plaintiff told Dr. Dutta that she stopped smoking in 2005; occasionally drank; independently showered, dressed, cooked, cleaned, did laundry and shopped "to some extent." Dr. Dutta noted that she did not appear to be in acute

distress; she limped on her left side; abnormally squatted one-third of the way down; used a walker as part of her post-operation care, but was able to walk and stand without the walker with a limp; she did not need assistance changing, ascending or descending the examination table; and rose from her chair without difficulty.

Dr. Dutta's examination revealed left knee flexion of up to 110 degrees; slightly tender and swollen left knee; full range of motion in the left knee; no muscle atrophy; no joint effusion, inflammation or instability. An x-ray of the left knee revealed status post joint replacement without evidence of loosening. Dr. Dutta diagnosed the Plaintiff with status post left knee replacement surgery, in progress of recovery; and anxiety. He stated that she had mild limitations for sitting; and moderate limitations for walking, standing for a long time, and lifting heavy weight on a continued basis.

On May 2, 2013, the Plaintiff returned to Dr. Alpert for a follow-up. Dr. Alpert noted that she was "doing very well." The Plaintiff was using a crutch to get around, but her pain and swelling had improved. There was still some pain and soreness around the knee. On examination, her range of motion was from 5 degrees to 110 degrees; she had slight effusion; and no tenderness. An x-ray showed no signs of loosening or tear. He directed her to continue physical therapy.

On December 18, 2013, the Plaintiff told Dr. Alpert that she still had a fair amount of pain in her knee; had pain in bed when she moved her leg; had pain when she sat for prolonged periods of time; and could not stand for long periods of time. On examination, her range of motion was 0 degrees to 125 degrees. She had slight instability in 30 degrees of flexion but none in full extension. She had discomfort with hyperextension. She could bend to about 115 degrees and her knee was tender. Dr. Alpert recommended icing and activity modification.

Dr. Alpert wrote a letter on January 13, 2014, summarizing his treatment of the Plaintiff and the findings he detailed in the April 8, 2013 questionnaire. He said that his findings in the questionnaire remained valid as of the date of the letter. He further said that after the total knee replacement surgery, the Plaintiff experienced increasing crepitation in the knee, with catching, and a positive patellar clunk, which required another arthroscopic surgery.

On February 26, 2014, the Plaintiff told Dr. Alpert that she continued to have pain in her left knee; that she felt clicking; and could not do any functional activities. On examination, her range of motion was 0 degrees to 120 degrees with normal tracking; there was no more crepitation; there was a instability at 30 degrees; she had tenderness over the pes bursa and the lateral joint line. An x-ray showed that the knee replacement was in good position, without signs of loosening or wear. He recommended a soft knee brace, icing and Lidoderm patches.

On April 28, 2014, Plaintiff returned to Dr. Alpert with complaints of significant pain and instability. Her range of motion was 0 degrees to 125 degrees. She had slight instability at 0 degrees to 30 degrees and 90 degrees. Dr. Alpert recommended activity modification; continued use of the brace; and prescribed Percocet. On May 28, Plaintiff complained of worsening pain and instability. Her range of motion was unchanged and she had some instability. There was diffuse point tenderness.

An x-ray and bone scan of the left knee on June 16, 2014 showed findings suspicious for prosthetic loosening of the tibial component or stem. On June 23, 2014, Dr. Alpert aspirated her left knee and performed laboratory testing. He noted they would consider either a revision left total knee replacement or a two-stage replant for infection.

On July 14, 2014, the Plaintiff reported to Dr. Alpert that she continued to have pain and instability and required a brace. Dr. Alpert noted that she was "grossly unstable," but the recent

scans, bloodwork and aspiration were all negative for infection or loosening. On examination, she had range of motion from 0 degrees to 125 degrees with crepitation; a 1+ effusion; and there was varus, valgus instability that was relatively severe. He recommended that the Plaintiff obtain a second opinion as to whether revision prosthesis was necessary.

### c. After the ALJ's Decision of August 14, 2014

On August 20, 2014, Dr. Michael Ciminiello performed a consult for the Plaintiff. On examination, the Plaintiff's range of motion was 0 degrees to 125 degrees. X-rays revealed fixed and positioned total knee arthroplasty components. The doctor recommended revision arthroplasty due to pain, function, and bone stock.

On September 22, 2014, the Plaintiff returned to Dr. Alpert. He noted that the Plaintiff needs to wear a knee brace or her knee buckles on her. She could not sit/stand/walk/do stairs/quat or pivot for any length of time. Dr. Alpert stated that the Plaintiff had seen Dr. Ciminiello in consultation and he had agreed that she needed a revision left knee replacement, possibly even to a hinged prosthesis. Her physical examination was unchanged from pervious examinations with instability to varus and valgus stress. She had slight effusion, crepitation, and range of motion from 0 degrees to 125 degrees. Dr. Alpert recommended that she not sit, stand, or walk for any length of time. On December 18, 2015, her examination was the same, with the modification that there was no effusion. She complained of pain and trouble walking, climbing stairs, and sleeping. Dr. Alpert planned to proceed with a revision left knee total replacement.

On January 7, 2015, the Plaintiff returned to Dr. Ciminiello and complained of buckling and giving way, with pain and swelling. Examination findings were unchanged.

On February 23, Plaintiff underwent a left total knee revision arthroplasty. On March 25, Dr. Ciminiello prescribed oxycodone. She returned to Dr. Ciminiello on April 1. She stated that

she had pain but no instability.  On examination, there was minimal swelling and the knee was stable.  Active range of motion was 5 degrees to 100 degrees of flexion.  X-rays showed well fixed and positioned revision total knee arthroplasty components.  Dr. Ciminiello said that she was to use a cane; continue physical therapy; and wean herself off of narcotic pain medication.

On July 1, 2015, Dr. Alpert completed a second Lower Extremities Impairment Questionnaire.  Clinical findings included limited range of motion from 15 degrees to 105 degrees; tenderness; muscle atrophy; swelling; and joint deformity.  Her symptoms included pain, loss of sensation, fatigue with activity, cramping, and an inability to completely extend her left leg.  She could independently initiate ambulation, but needed a cane to sustain ambulation and complete an activity.  She could not climb stairs without help of a handrail.  She could regularly carry out activities of daily living independently.  In an 8 hour day, Dr. Alpert said that the Plaintiff could sit up to 3 hours; stand/walk up to 1 hour; could not sit/stand/walk continuously, would have to get up and move around every 15-20 minutes, and sit after 20 minutes; occasionally lift up to 10 pounds and never lift more than 10 pounds; and occasionally carry up to 5 pounds and never carry more than 5 pounds.  The Plaintiff's left leg always needed to be elevated.  Her pain, fatigue, or other symptoms would frequently interfere with her attention and concentration.  Dr. Alpert did not believe that emotional factors contributed to the Plaintiff's symptoms and limitations.  She would need to take a 10-minute unscheduled break every 15 to 20 minutes and would be absent from work more than three times a month.  She needed to avoid: temperature extremes; humidity; and heights.  She could not pull, kneel, or stoop

On July 29, 2015, Dr. Eric Mango ("Dr. Mango"), an orthopedic surgeon, examined the Plaintiff.  Dr. Mango wrote a letter to the Plaintiff's counsel on August 18, 2015, in which he detailed his examination.  It appears that he reviewed the Plaintiff's cumulative medical records

from 2008 through 2015. On examination, Dr. Mango assessed swelling and effusion; evidence of atrophy in the Plaintiff's quadriceps; "exquisite palpable tenderness over the medial joint and antero-medial proximal tibia; and range of motion from 15 degrees to 125 degrees with a 15 degree flexion contracture. His clinical impressions included chronic flexion contracture of the left knee; chronic pes bursitis of the left knee; status-post multiple left knee surgeries; and resolved anteromedial right knee pain with mild degenerative changes of the patellofemoral joint and medial compartment. He believed that she was totally disabled; the prognosis for her eventual recovery was poor; she had not reached maximum medical improvement; required additional orthopedic treatment; and would benefit from further physical therapy and pain management. He could not rule out the possibility that she would require additional knee surgery, including another revision total knee arthroplasty or possible arthrodesis. Dr. Mango further stated that the Plaintiff could experience a return of right knee pain and swelling, with an altered gait, due to persistent left knee pain and flexion contracture. As to that, Dr. Mango could not rule out right knee surgery.

On August 19, 2015, Dr. Mango completed a Lower Extremities Impairment Questionnaire. He listed the diagnoses detailed above. His clinical findings included limited range of motion in the left knee; tenderness of the left knee joint; muscle atrophy of the left quadriceps; weakness measured at 4/5; swelling and effusion of the left knee; abnormal gait; and decreased sensation of the left knee. Dr. Mango listed the Plaintiff's primary symptoms as pain, fatigue, loss of motion, difficulty performing activities of daily living, and decreased sensation over the knee. She had daily, deep, sharp, and chronic pain. She used a cane and could walk short distances only. She could not climb stairs without a handrail. She could carry out activities of daily living with some difficulty, including traveling to and from her house and appointments, preparing meals, bathing, and dressing.

Dr. Mango said that in an 8 hour day, the Plaintiff could sit 2-3 hours; and stand/walk 1-2 hours. It was necessary or medically recommended that the Plaintiff not sit or stand/walk continuously; she would have to get up and move around every 30 minutes; she could occasionally lift/carry up to 10 pounds; and never lift or carry more than that. She would need to elevate both legs for at least a half hour, depending on swelling and pain. Her symptoms would frequently interfere with her attention and concentration. Dr. Mango believed that her pain, fatigue or other symptoms would frequently interfere with her concentration and attention. He further said that the Plaintiff was unable to work in any capacity, based on her flexion to 15 degrees, pain, and her difficulties performing activities of daily living. Plaintiff would require unscheduled breaks every 30 minutes and miss work more than three times a month. She needed to avoid temperature extremes. She could not: push; pull; kneel; bend; stoop; climb stairs; squat; or stand for prolonged periods of time. Dr. Mango indicated that the earliest date his assessment applied to was June 10, 2008.

### 2. Non-Medical Evidence

#### a. The Plaintiff's March 26, 2013 Function Report

On March 26, 2013, the Plaintiff completed a Function Report. She reported that she was unable to walk long distances; sit for long periods of time; squat or climb stairs; drive for long periods of time; work; or exercise. She reported that pain kept her awake at night and she was unable to sleep in certain positions. She said that she needed assistance with her personal care: putting on socks and shoes; she required a shower chair and would not shower home alone; and required assistance when preparing food because she could not stand too long to cook. To that end, she said that she made quick and easy meals daily. She reported that she was able to fold clothes, but was not able to do other housework, and rarely went outside. She said that when she

goes outside, she rides as a passenger in the car. She could not drive. Her family went shopping for her. Her hobbies included reading, music, television and spending time with her family. Her social activities included talking on the phone and spending time with her family.

She detailed further physical limitations. She could only lift very light objects that did not require the use of her legs; stand for short period of time; walk short distances with a walker; and she could not sit for long periods of time. She said that she was unable to climb stairs or kneel; could only minimally squat; and could only reach short distances. She reported that she used crutches and a walker. She opined that she was able to walk 150 feet before having to rest for about five minutes. She said that she could finish whatever chores she started.

### b. The Plaintiff's Testimony at the Administrative Hearing

The Plaintiff testified at the July 15, 2014 administrative hearing. She was 49 years old at the time. She graduated high school and attended some college. Her last date of work was in February 2009, but she only worked for a month at that time. Before that, her last date of work was August 2008. She worked as a nurse for 23 years. She testified that she stopped working in 2008 because she injured her leg and had an ACL/meniscus tear and had surgery to repair it. She recovered, but then tore her meniscus again and had another surgery.

The Plaintiff testified that she was unable to sit for long periods of time because her knees would get stiff. Specifically, she said that she could only sit for 15 minutes at a time. She could not sit continuously for an hour and would usually lay sideways on her couch with her legs up. She could walk half a block and lift 10 pounds. Standing caused pain in her right hip. She could stand for about six or seven minutes. She was unable to squat, kneel, use stairs, or "reach anything that's too high" or "too low." (R. at 105).

The Plaintiff said that she experienced severe depression because she was unable to return to work. Her anxiety had worsened because of further setbacks, and she was having difficulty sleeping. She was taking Trazadone, Klonopin, Prozac and Wellbutrin to help with her mood, anxiety attacks, and her sleep.

The Plaintiff testified that on a typical day, she isolated herself. Sometimes she went to her mother's house and spent the day with her. She did minimal cooking and very light cleaning. She was able to drive, but needed help getting in and out of the car. She sometimes went out to dinner with her daughter. She did not go to the movies because she was unable to sit that long. She experienced fatigue during the day and would nap. Her pain medication would make her tired and unable to drive or concentrate. She could dress and shower herself, but required help if she was putting on boots. She experienced panic attacks a couple of times a week, and they would last until her Klonopin kicked in.

### c. The Vocational Expert's Testimony at the Administrative Hearing

Amy Leopold, a vocational expert (the "VE"), also testified at the administrative hearing. The ALJ asked the VE if the Plaintiff could do her former job if she could lift 10 pounds frequently and 20 pounds occasionally; could sit for 6 hours in an 8 hour day; could stand and walk for 4 hours in an 8 hour day; and could occasionally crouch, climb, stoop, and crawl. The VE said that the Plaintiff could not. The VE further testified that a hypothetical person similarly situated to the Plaintiff in age, education, and work experience with those limitations could perform unskilled labor such as a clerk or a cashier. The VE said that if the Plaintiff could not sit for more than 15 minutes at a time, or an hour or two total during an 8 hour day, she could not do those jobs. If that same person also was unable to concentrate, that person would not be able to sustain employment.

Plaintiff's counsel asked the VE to consider the original hypothetical individual with the added limitation that such an individual could not stoop. The VE testified that an inability to stoop would not affect an individual from being able to perform the duties or a clerk, cashier or receptionist. Plaintiff's counsel then asked the VE to consider the added limitations that the individual could sit for four hours and stand for one hour in an eight-hour day. The VE testified that such an individual could not perform Plaintiff's past relevant work or the three jobs identified.

## C.  The ALJ's August 14, 2014 Decision

The ALJ found that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2014, and that she had not been engaged in substantial gainful activity since February 2, 2009. The ALJ found that the Plaintiff had a severe impairment—namely, a left knee disorder as defined in 20 C.F.R. 404.1520(c). As to that left knee disorder, the ALJ found that it did not meet the criteria of the listed impairments in 20 C.F.R. Part 404, Subpart P. Then, the ALJ found that the Plaintiff had the residual functional capacity (the "RFC") to perform a range of light work, except that she could only lift or carry up to 10 pounds frequently and 20 pounds occasionally; sit up to 6 hours in an 8 hour day; stand or walk up to 4 hours during an 8 hour day; occasionally climb, stoop, kneel, crouch, or crawl; and frequently balance. The Plaintiff had no manipulative, visual, environmental, or mental limitations.

The ALJ determined that the Plaintiff was unable to perform her past relevant work because her RFC precluded her from exerting the amount of effort required to be a registered nurse. However, the ALJ found that occupations existed in significant numbers in the national economy that the Plaintiff, with her RFC, could perform, such as a clerk, cashier, or receptionist. Accordingly, the ALJ found that the Plaintiff was not disabled under the Act.

## D. The Present Appeal

On appeal, the Plaintiff argues that the ALJ failed to properly weigh the medical opinion evidence in that the ALJ did not give the opinion of the Plaintiff's treating physician controlling weight; that the ALJ failed to properly evaluate the Plaintiff's credibility; and that the Appeals Council failed to consider new and material evidence that the Plaintiff submitted to it after the ALJ's decision.

The Commissioner argues in opposition that substantial evidence supports the ALJ's RFC finding; that the ALJ properly evaluated the medical opinion of the Plaintiff's treating physician as well as the Plaintiff's credibility; and that the evidence submitted to the Appeals Council does not warrant remand.

## II. DISCUSSION

## A. Applicable Law

The Act defines the term "disability" to mean an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." *Burgess v. Astrue*, 537 F.3d 117, 119 (2d Cir. 2008) (quoting 42 U.S.C. § 423(d)(1)(A)) (quotation marks omitted). In addition, "[t]he impairment must be of 'such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.' " *Shaw v. Chater,* 221 F.3d 126, 131–32 (2d Cir. 2000) (quoting 42 U.S.C. § 423(d)(2)(A)).

In determining whether a claimant is disabled, the Commissioner is required to apply the five-step sequential process set forth in 20 C.F.R. § 404.1520. *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir. 1999). The claimant bears the burden of proving the first four steps, but then the burden

shifts to the Commission at the fifth step. *Rosa,* 168 F.3d at 77. First, the Commissioner considers whether the claimant is presently working in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i); *Rosa,* 168 F.3d at 77. If the claimant is not so engaged, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii); *Rosa,* 168 F.3d at 77. If the severity requirement is met, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in Appendix 1 of the regulations, or is equal to a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, Appendix 1; *Rosa,* 168 F.3d at 77. If the claimant has such an impairment, there will be a finding of disability. If not, the fourth inquiry is to determine whether, despite the claimant's severe impairment, the claimant's residual functional capacity allows the claimant to perform his or her past work. 20 C.F.R. § 404.1520(a)(4)(iv); *Rosa,* 168 F.3d at 77. Finally, if a claimant is unable to perform past work, the Commissioner then determines whether there is other work, such as "light work" discussed *infra,* that the claimant could perform, taking into account, *inter alia,* the claimant's residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v); *Rosa,* 168 F.3d at 77.

**B. The Standard of Review**

"Judicial review of the denial of disability benefits is narrow" and "[t]he Court will set aside the Commissioner's conclusions only if they are not supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Koffsky v. Apfel*, 26 F. Supp. 475, 478 (E.D.N.Y. Nov. 16, 1998) (Spatt, *J.*) (citing *Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir. 1998)).

Thus, "the reviewing court does not decide the case *de novo.*" *Pereira v. Astrue*, 279 F.R.D. 201, 205 (E.D.N.Y. 2010). Rather, "the findings of the Commissioner as to any fact, if

supported by substantial evidence, are conclusive," *id.*, and therefore, the relevant question is not "whether there is substantial evidence to support the [claimant's] view"; instead, the Court "must decide whether substantial evidence supports *the ALJ's decision.*" *Bonet v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (emphasis in original). In this way, the "substantial evidence" standard is "very deferential" to the Commissioner, and allows courts to reject the ALJ's findings "'only if a reasonable factfinder would *have to conclude otherwise.*'" *Brault v. SSA*, 683 F.3d 443, 448 (2d Cir. 2012) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994) (emphasis in original)). This deferential standard applies not only to factual determinations, but also to inferences and conclusions drawn from such facts." *Pena v. Barnhart*, No. 01-cv-502, 2002 U.S. Dist. LEXIS 21427, at *20 (S.D.N.Y. Oct. 29, 2002) (citing *Levine v. Gardner*, 360 F.2d 727, 730 (2d Cir. 1966)).

In this context, "'[s]ubstantial evidence' means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Burgess*, 537 F.3d at 128 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)). An ALJ's findings may properly rest on substantial evidence even where he or she fails to "recite every piece of evidence that contributed to the decision, so long as the record 'permits [the Court] to glean the rationale of [his or her] decision.'" *Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). This remains true "even if contrary evidence exists." *Mackey v. Barnhart*, 306 F. Supp. 337, 340 (E.D.N.Y. 2004) (citing *DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998), for the proposition that an ALJ's decision may be affirmed where there is substantial evidence for both sides).

The Court is prohibited from substituting its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review. *See Koffsky*, 26 F. Supp. at 478 (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)).

## C. Application to the Facts Of This Case

### 1. As to Whether the ALJ Properly Used the Treating Physician's Rule

In finding that the Plaintiff had the RFC to perform light work, the ALJ said that he afforded "great weight [] [] to the opinion of Dr. Dutta, as it [was] based upon a complete examination." (R. at 81). As to Dr. Alpert's opinion, he afforded "great weight" as to Dr. Alpert's assessment from April 8, 2013, where he said that the Plaintiff could lift 10 pounds frequently and 20 pounds occasionally and did not need to elevate her legs. However, the ALJ afforded "less weight" to the remainder of Dr. Alpert's assessment of the Plaintiff's abilities. Specifically, the ALJ afforded less weight to Dr. Alpert's opinion as to how long she could sit/stand/walk; how often she needed breaks from each of those activities; could not travel to appointments; the severity of her pain, fatigue, etc.; and how often she would miss work. The ALJ said that these opinions were "inconsistent with diagnostic imaging . . . and inconsistent with her activities of daily living . . . . Dr. Alpert's opinion [was] also not consistent with the clinical findings of Dr. Dutta." (*Id.*). Therefore, to summarize the ALJ's reasoning, he relied upon the Plaintiff's diagnostic imaging tests, the Plaintiff's reports of her activities of daily living, and the clinical findings of Dr. Dutta to support his RFC and to only afford less weight to Dr. Alpert's opinion. For the following reasons, the Court finds that Dr. Alpert's medical opinion should have been afforded controlling weight because it was supported by substantial evidence.

"The method by which the Social Security Administration is supposed to weigh medical opinions is set forth at 20 C.F.R. § 404.1527[c]." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

Relevant here, "[t]he regulations say that a treating physician's report is generally given more weight than other reports and that a treating physician's opinion will be controlling if it is 'well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record.' " *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)).

This rule — the "Treating Physician Rule" — reflects the generally-accepted view that "the continuity of treatment [a treating physician] provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient." *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (quoting *Mongeur*, 722 F.2d at 1039 n.2 (internal quotation marks omitted)); *see Genier v. Astrue*, 298 F. App'x. 105, 108 (2d Cir. 2008) (noting that the regulations recognize that treating physicians "are likely to be the medical professionals most likely to provide a detailed, longitudinal picture of . . . medical impairment" (quoting 20 C.F.R. § 416.927(d)(2))).

Generally, where the ALJ declines to give controlling weight to a treating physician's opinion, he must provide the claimant with "good reasons" for doing so, and must consider various factors to determine how much weight to give the opinion. *See Blanda v. Astrue*, No. 05-cv-5723, 2008 U.S. Dist. LEXIS 45319, at *18, 2008 WL 2371419 (E.D.N.Y. June 9, 2008); 20 C.F.R. § 404.1527(c)(2). In particular, "to override the opinion of the treating physician, [the Second Circuit] ha[s] held that the ALJ must explicitly consider, *inter alia*, (1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (citing *Burgess*, 537 F.3d at 129).

Where a treating physician's opinion is contradicted by substantial evidence in the record, the opinion will not be afforded controlling weight. *Snell*, 177 F.3d at 133 ("When other

substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling."). Additionally, findings that "a claimant is disabled and cannot work . . . are reserved to the Commissioner," and a treating physician's opinion on these points is not afforded controlling weight. *Id.* at 133 (internal citations omitted); *see also* 20 C.F.R. § 404.1527(e)(1). Thus, the ALJ "considers the data that physicians provide but draws [his or her] own conclusions as to whether those data indicate disability ." *Snell,* 177 F.3d at 133.

Although the ALJ did not expressly go through the factors laid out above when affording the opinion of the Plaintiff's treating physician less weight, that alone is not necessarily reversible error. *See Halloran*, 362 F.3d at 31 ("[T]he ALJ applied the substance of the treating physician rule."). However, in the Court's view, the treating physician's opinion is not contradicted by substantial evidence in the record, and therefore should have been afforded controlling weight.

As to the reliance on the diagnostic imaging, there is no medical evidence that contradicts Dr. Alpert's assessment of the November 11, 2011 MRI. Since Dr. Alpert's medical opinion regarding the MRIs was not contradicted by another medical professional, the ALJ substituted his own judgment when stating that Dr. Alpert's opinion was inconsistent with diagnostic imaging. An ALJ cannot substitute lay interpretation of available medical data for that of a treating specialist. *See Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (summary order) ("[T]he ALJ was not at liberty to substitute his own lay interpretation of that diagnostic test for the uncontradicted testimony of [the treating physician], who is more qualified and better suited to opine as to the test's medical significance"); *Balsamo v. Chater,* 142 F.3d 75, 91 (2d Cir. 1998) ("[I]t is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against

that of a physician who submitted an opinion to or testified before him.") (quoting *McBrayer v. Sec'y of Health and Human Servs.,* 712 F.2d 795, 799 (2d Cir. 1983) (internal alterations omitted)).

The November 11, 2011 MRI is also important in that it shows that the ALJ's reliance on Dr. Dutta's findings was also misplaced. Of importance, there is no evidence that Dr. Dutta examined the Plaintiff's November 11, 2011 MRI. Dr. Alpert said that he based his opinions on the Plaintiff's x-ray and MRI from October and November 2011. Dr. Dutta only reviewed one x-ray. Therefore, Dr. Dutta's opinion "was flawed by the fact that he did not examine [a] key piece of evidence in the record . . . thus the ALJ's reliance on Dr. [Dutta's] opinion was itself a flaw." *Burgess*, 537 F.3d at 131 (finding that an MRI was a key piece of evidence that the consultative physician needed to consider). Therefore, it was error for the ALJ to rely on Dr. Dutta's medical opinion because Dr. Dutta did not consider key medical evidence—the November 10, 2011 MRI; and since there was not any medical evidence to contradict Dr. Alpert's assessment of the diagnostic imaging, it was error for the ALJ to substitute his own lay judgment about the diagnostic imaging.

Dr. Dutta's clinical findings were also unhelpful because they were vague regarding the Plaintiff's limitations. The ALJ said that he based his determination that the Plaintiff could do limited sedentary work on Dr. Dutta's assessment that the Plaintiff only had mild limitations for sitting and moderate limitations for walking, standing and sitting. However, the Second Circuit has explicitly said that a "[doctor]'s use of the terms 'moderate' and 'mild,' without additional information, does not permit the ALJ, a layperson notwithstanding [his] considerable and constant exposure to medical evidence, to make the necessary inference that [the plaintiff] can perform the exertional requirements of sedentary work." *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) *superceded by statute on other grounds,* 20 C.F.R. § 404.1560(c)(2); *see also Selian*, 708 F.3d at

421 ("[The consultative examiner's] opinion is remarkably vague. What [the consultative examiner] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation . . . . [The consultative examiner's] opinion does not provide substantial evidence to support the ALJ's finding that [the plaintiff] could lift 20 pounds occasionally and 10 pounds frequently."). Dr. Dutta's assessment is similarly vague here. The ALJ did not cite to any substantial evidence that would support a finding that the Plaintiff is able to sit for 6 hours. A "mild limitation for sitting" does not have any meaning and is not substantial evidence.

Finally, there is no evidence that the Plaintiff's daily activities contradict Dr. Alpert's findings. The Plaintiff said that she was able to prepare fast quick meals because she cannot stay on her feet; and she testified that she was able to do light housework, and wrote in her function report that she only folded clothes. Although she testified that she could drive, she said that she needed help getting in and out of the car. In her function report, she stated that she did not run her own errands; needed a shower seat to shower and did not shower when she was home alone.

The Second Circuit "ha[s] stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act." *Balsamo*, 142 F.3d at 81 (quoting *Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir. 1988)). Indeed, because the ALJ found that the Plaintiff had shown that her impairments prevented her from doing her past work, "it was the Commissioner's burden to demonstrate that [the Plaintiff] had retained the functional capacity to perform . . . [light] work." *Rosa*, 168 F.3d at 78 (internal citations and quotation marks omitted). The Commissioner did not demonstrate how her daily activities related to her ability to perform light work, and they do not support the ALJ's RFC finding.

An ALJ may only rely on consultative physicians' opinions when they are supported by substantial evidence. *See Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he

regulations . . . permit the opinions of nonexamining sources to override treating sources' opinions provided they are supported by evidence in the record."). The only evidence that supports Dr. Dutta's opinion is Dr. Dutta's opinion. The ALJ said that he afforded great weight to Dr. Dutta's opinion because it was a "complete examination." This is a conclusory statement, and the Court is unsure what it means. The ALJ did not set forth reasons why Dr. Dutta's opinion should be afforded great weight, and that was error. *See Brown v. Comm'r of Soc. Sec.*, No. 06-CV-3174 ENV MDG, 2011 WL 1004696, at *4 (E.D.N.Y. Mar. 18, 2011) ("The ALJ's heavy reliance on [the consultative physician]'s testimony also contravened the clear guidance of SSA regulations, as [the consultative physician] was a nonexamining source whose opinions are to be accorded less weight than those of examining sources and especially treating sources."); *see also Nusraty v. Colvin*, No. 15-CV-2018 (MKB), 2016 WL 5477588, at *14 (E.D.N.Y. Sept. 29, 2016) ("The ALJ improperly relied on the vague opinion of a non-examining physician over the conclusions of Plaintiff's treating physician."). As shown above, Dr. Dutta's findings were not supported by substantial evidence and therefore it was error to rely on them.

Therefore, since the evidence that purportedly contradicted Dr. Alpert's medical opinion was not substantial evidence, the opinion should have been afforded controlling weight. As to the factors laid out in *Selian*, 708 F.3d at 418, Dr. Alpert treated the Plaintiff for roughly three years during the relevant period and saw her about every two to three months. Dr. Alpert provided support for his findings through his examinations and the diagnostic imaging. As discussed above, Dr. Alpert's opinion is not contradicted by the remaining medical evidence because Dr. Dutta's opinion cannot be relied upon. Finally, Dr. Alpert is a specialist in that he is an orthopedic surgeon.

Accordingly, the medical opinion of Dr. Alpert should have been afforded controlling weight. The opinion of Dr. Dutta, the consulting physician, was not supported by substantial evidence, and therefore should not have been relied upon.

**2. As to Whether the ALJ Properly Evaluated the Plaintiff's Credibility**

The ALJ found the Plaintiff's statements about the intensity and persistence of her impairment not credible. The Plaintiff argues that the ALJ failed to consider the non-exhaustive list of seven factors that ALJs must examine. The Commissioner said that "the ALJ discussed Plaintiff['s] activities of daily living . . . . Additionally, the record does not contain evidence that Plaintiff's medications resulted in any significantly limiting side effects." (Commissioner's Brief at 39). The Court agrees that the ALJ failed to properly evaluate the Plaintiff's credibility because he failed to utilize the seven factors; did not consider that her testimony was supported by the opinion of her treating physician; and did not account for the fact that she had twenty-five years of work history.

The SSA regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. First, the ALJ must decide whether the claimant suffers from "a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." 20 C.F.R. § 404.1529(b). Second, where the record shows that the claimant has such a medically determinable impairment, the ALJ evaluates "the intensity and persistence of [the claimant's] symptoms [to] determine" the extent to which they limit the claimant's ability to work. 20 C.F.R. § 404.1529(c).

Where the ALJ finds that the claimant's testimony is inconsistent with the objective medical evidence in the record, the ALJ must evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the

pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)–(vii).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010). Where the ALJ neglects to discuss at length his credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence, remand is appropriate. *Id.* at 435–36; *see also Grosse v. Comm'r of Soc. Sec.,* 2011 WL 128565, at *5 (E.D.N.Y. Jan.14, 2011) (finding the ALJ committed legal error by failing to apply factors two through seven); *Valet v. Astrue,* 2012 WL 194970, at *22 (E.D.N.Y. Jan.23, 2012) (remanding because the ALJ failed to address all seven factors).

The record shows that the ALJ did not consider these seven factors. The ALJ stated that the "claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. at 79). The ALJ's reasons are seemingly the same as the reasons he used to rely upon Dr. Dutta's opinion: Dr. Dutta's findings; a disagreement with Dr. Alpert's findings; and the Plaintiff's daily activities. The ALJ did not discuss the location, duration, frequency or intensity of the Plaintiff's pain; precipitating or aggravating factors; the Plaintiff's medications; the fact that the Plaintiff has had five left knee surgeries, that none of them completely cured her problem, and she may require

further surgery; or the Plaintiff's physical therapy or other non-medical treatment. Therefore, the ALJ's credibility determination was flawed. It was further flawed because the ALJ did not give controlling weight to Dr. Alpert's medical opinion, and "[t]he ALJ's proper evaluation of [the treating physician's] opinions [will] necessarily impact the ALJ's credibility analysis." *Mortise v. Astrue*, 713 F. Supp. 2d 111, 124–25 (N.D.N.Y. 2010). In fact, the Plaintiff's testimony is consistent with her treating physician's assessment of her abilities.

As to the daily activities, which the ALJ relied heavily upon, the Plaintiff did not "engage[] in any of these activities for sustained periods comparable to those required to hold a sedentary job." *Balsamo,* 142 F.3d at 81 (quoting *Carroll v. Sec'y of Health and Human Servs.,* 705 F.2d 638, 643 (2d Cir. 1983) (where claimant read, watched television, listened to the radio, and rode public transportation, such activities were insufficient to show he was capable of sedentary work)); *see also Martin v. Astrue,* 2009 WL 2356118, at *12 (S.D.N.Y. July 8, 2011) ("mundane tasks of life . . . do not necessarily indicate that [a claimant] is able to perform a full day of sedentary work"); *Murdaugh v. Sec'y of Dept. of Health & Human Servs.,* 837 F.2d 99, 102 (2d Cir. 1988) (finding claimant who watered the garden and occasionally visited friends disabled).

Finally, the ALJ erred by failing to evaluate the Plaintiff's long work history of approximately 25 years when making a credibility assessment. "A plaintiff with a good work history is entitled to substantial credibility when claiming inability to work." *Bradley v. Colvin*, 110 F. Supp. 3d 429, 447 (E.D.N.Y. 2015) quoting *Rivera v. Schweiker,* 717 F.2d 719, 725 (2d Cir. 1983) (internal quotation marks omitted)).

Accordingly, the Court finds that the ALJ's credibility determination is not supported by substantial evidence.

## III. CONCLUSION

Therefore, because the ALJ incorrectly evaluated the Plaintiff's credibility and the treating physician's medical opinion, the ALJ's decision is not supported by substantial evidence. The Court need not address the Plaintiff's final argument that the Appeals Council should have considered the additional evidence that was submitted by the Plaintiff.

The Court is remanding this case solely for the calculation and award of benefits. *See Mariani v. Colvin*, 567 F. App'x 8, 11 n.3 (2d Cir. 2014), *as amended* (July 30, 2014) (stating that "where remand for further evidentiary proceedings would serve no purpose," remand "solely for the calculation of benefits is the appropriate remedy" (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)); *Bradley*, 110 F. Supp. 3d at 447 (same); *Fernandez v. Astrue*, No. 11-CV-3896 DLI, 2013 WL 1291284, at *20 (E.D.N.Y. Mar. 28, 2013) ("There is no basis to conclude that remanding to obtain additional evidence would support the Commissioner's decision."); *McKissick v. Barnhart*, No. 01 CV 1550, 2002 WL 31409933, at *16 (E.D.N.Y. Sept. 30, 2002) (finding remand pointless where the medical record confirmed the treating physicians' opinions that plaintiff was disabled and incapable of performing even sedentary work). In *Fernandez*, the District Court remanded the case solely for the determination of benefits because the ALJ "(1) lacked good reasons for failing to give controlling weight to Plaintiff's treating physicians' diagnoses and assessments of Plaintiff's ability to work; (2) improperly adopted wholesale the findings and opinion of the non-examining medical consultant; (3) failed to give any basis for rejecting Plaintiff's testimony of his severe and constant pain; and (4) improperly determined Plaintiff's RFC." 2013 WL 1291284, at *20.

Similar factors were present in *Bradley*, and the same factors are present here. The vocational expert testified that a person with the physical limitations detailed by Dr. Alpert would

not be able to sustain employment.  The evidence in the record demonstrates that the Plaintiff, after five knee operations, is disabled and the Commissioner would be unable to meet her burden at the fifth step to show that the Plaintiff can perform other work.

Therefore, for the reasons set forth above, the Plaintiff's motion for a judgment on the pleadings pursuant to Rule 12(c) is granted, and the Commissioner's motion for a judgment on the pleadings pursuant to Rule 12(c) is denied.  The case is remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g), solely for the calculation and payment of benefits.

The Clerk of the Court is respectfully directed to close this case.


It is **SO ORDERED:**

Dated: Central Islip, New York

March 6, 2017

_____ */s/ Arthur D. Spatt*__ _____

ARTHUR D. SPATT

United States District Judge